UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
MARTHA GRAHAM, MARIA GRIMALDI,
LLOYD HELLER, PAULA MANZOLILLO, and
CREAMTON MAPLE TRUST f/b/o CARL
MILLS,

                      Plaintiffs,                  08 Civ. 9357 (PKC)

        -against-

                                            <u>MEMORANDUM AND ORDER</u>

LLOYD V. BARRIGER, THE ESTATE OF
ANDREW MCKEAN, LINDA BARRIGER,
THE GAFFKEN & BARRIGER FUND LLC,
G&B PARTNERS, INC, BARRIGER AND
BARRIGER INC., BARRIGER CAPITAL INC.,
GITLIN & ASSOCIATES, LLP, IRWIN
GITLIN, and JOHN DOE (THE UNKNOWN
INDIVIDUAL OR LEGAL ENTITY WHICH
ACTED AS AUDITOR FOR THE GAFFKEN &
BARRIGER FUND, INC.),

                      Defendants.
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        The plaintiffs allege that they were misled into investing in a commercial

real-estate financing fund that collapsed when the national real estate market entered a

downturn.  The plaintiffs – whose individual losses are alleged to range from

approximately $31,000 to $265,000 – claim that they were inadequately apprised of the

risks attendant upon making loans to subprime commercial real estate borrowers.  When

borrower defaults accumulated, the investors lost their principal and stopped receiving

payments on a promised 8% percent return.

        The plaintiffs allege violations of section 10(b) of the Securities and

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17

C.F.R. § 240.10b-5, and allege that certain defendants are liable as control persons under section 20(a) of the 1934 Act, 15 U.S.C. § 78t.  They also assert common-law claims of fraud and breach of contract.[1]  The defendants move to dismiss the Second Amended Complaint (the "Complaint") for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., and for failure to plead fraud with the particularity required by Rule 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1) ("PSLRA").  For the reasons explained below, the motions to dismiss are granted. The motion for sanctions brought by an accountant and his firm, both of which are defendants, is denied without prejudice.


BACKGROUND

The facts as described in this section are drawn from the allegations set forth in the Complaint, and are assumed as true for purposes of this motion.  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 193 (2d Cir. 2009).  All reasonable inferences are drawn in favor of the plaintiffs as non-movants.

Defendant Gaffken & Barriger Fund (the "Fund") was organized in or about January 1998.  (Compl. ¶ 9.)  The Fund originally pursued a strategy of trading in micro-cap equities.  (Compl. ¶ 35.)  In or about 2004, the Fund shifted its focus toward loans to subprime commercial borrowers, and it became increasingly leveraged as a result.  (Compl. ¶¶ 35, 39.)  As part of this new approach, the Fund engaged in a strategy that it described as asset-based lending: it anticipated borrower defaults, and then hoped

---

[1] In their submissions opposing the motions to dismiss, the plaintiffs have withdrawn a claim for unjust enrichment.

to recoup interest and principal while the borrower underwent foreclosure and bankruptcy.  (Compl. ¶ 37.)  According to the Complaint, the Fund's post-2004 strategy posed materially different risks from its original micro-cap investment strategy and was contrary to the safe and conservative investment approach promised by the defendants. (Compl. ¶ 38.)

      The change of investment philosophy was disclosed to the Fund's investors.  In a letter dated October 29, 2004, the Fund announced its new emphasis on a leverage-intensive strategy, stating that it hoped to enhance investor returns "while maintaining a conservative posture."  (Compl. ¶ 41; Ex. 5.)  The letter was signed by defendant Lloyd V. Barriger, the Fund's managing director. (Compl. ¶¶ 9, 41.)  In a letter dated January 31, 2005, Barriger further explained the strategy to accrue leverage in anticipation of bringing a higher return to the Fund, and offered a hypothetical investment scenario to illustrate how the Fund would profit from its strategy.  (Compl. ¶ 43.)

      In July 2005, Barriger wrote to the Fund's investors, asking that they respond to what he described as a "poll."  (Compl. ¶ 45.)  His letter stated that the Fund's "investment policy had changed, going from chiefly stocks to primarily real estate mortgages.  And always our guiding principle was to make the best return for you without taking undue risks."  (Compl. ¶ 45; emphasis omitted.)  He stated "that many regard our Fund as more of a fixed income investment," and that "the hard-money lending business" entails "certain costs" and "certain times when there is no current return."  (Compl. ¶ 45; emphasis omitted.)  "Consequently, the use of leverage which can greatly increase the return in good times can conversely sabotage the return in tough times when real estate is not as readily saleable."  (Compl. ¶ 45.)  These downsides

"would not be so apparent to one without experience."  (Compl. ¶ 45.)  Barriger asked

investors for feedback as to whether they "want a more modest, predictable, steady,

consistent return" of about 8% or whether they preferred "more risk and less consistency

and aim for higher returns."  (Compl. ¶ 45.)

A September 2005 letter reported on the responses: "The great majority of

you indicated that you were happy to leave the Fund exactly as it is; some of you

expressed a proclivity toward safety of principal and consistency of return."  (Compl. ¶

47.)  Barriger stated that he would "infuse some capital personally" and pay investors an

8% annual return, payable by monthly check.  (Compl. ¶ 47.)

Annexed to the September letter was a proposed amendment to the Fund's

LLC Agreement.  (Compl. ¶ 49.)  The Complaint does not allege in meaningful detail

how the Fund is structured and organized, but a review of the Fund's 1998 Private

Placement Memorandum ("PPM") indicates that investors purchased membership

interests in the Fund's limited liability company upon execution and delivery of the

Fund's subscription agreement.  (Compl. Ex. 1 at 2, 4.)  Investors also were asked to

execute a copy of the Fund's LLC Agreement, which denoted them as "investor

members" of the Fund, as distinguished from the Fund's managing member, G&B

Partners, Inc.  (Compl. Ex. 3 at 34-35.)  Thus, an investor in the Fund would become an

"investor member" of the LLC.  The 2005 amendment altered the Fund's purpose from

"investing, holding and trading in securities" and other financial instruments to

"investing, holding and trading in real estate, real estate loans, real estate securities, other

securities and other financial instruments."  (Compl. ¶ 51.)

In the months after September 2005, Barriger continued to issue
enthusiastic statements about the Fund's future.  In April 2006, he described the Fund's
progress on receiving a line of credit for $15 million.  (Compl. ¶ 62.)  The credit line was
deemed the product of "a great deal of investigation of our assets and our methods of
doing business" by the lender, Textron Financial.  (Compl. ¶ 65.)  According to the
Complaint, the line of credit was contingent on an undisclosed "fraud guaranty" in
Textron's favor, executed by Barriger and Andrew McKean.  (Compl. ¶ 66.)  The lending
agreement between the Fund and Textron states that Barriger and McKean "each
executed and delivered" to Textron a fraud guaranty "with respect to the transactions
contemplated by the Loan Agreement," but the contents of the guaranty are not alleged in
the Complaint or annexed as an exhibit. (Compl. Ex. 14 at 1 ¶B.)  A September 2006
letter from Barriger stated that investment capital exceeded $18.5 million and that Fund
management expected to extend $50 million in loans in 2007.  (Compl. ¶ 67.)  In
December 2006, the Fund reported that it was "more solid financially, and more on-track
to attain its purposes" than at any time since its formation.  (Compl. ¶ 83.)

Beginning in early 2007, however, the condition of the commercial real
estate market began to deteriorate, and the Fund's holdings suffered.  As an example, the
Complaint cites undisclosed promissory notes worth approximately $2.25 million that the
Fund acquired on the Platinum Properties of Central Florida, Inc., including $1.15 million
that the Fund acquired after Platinum Properties had gone into default.  (Compl. ¶¶69-
81.)  Barriger's communications to Fund investors remained upbeat in tone, however, and
noted that problems in sub-prime mortgages were centered on individual homeowner and
consumer debt, in contrast with the commercial loans pursued by the Fund.  (Compl. ¶

85.)  In an April 2007 letter, Barriger stated that as a "commercial property bridge lender[]," the Fund was "in a different business" than the residential mortgages subject to "a great deal of negative news recently."  (Compl. ¶ 89.)

According to the Complaint, the Fund's borrowing base began to plummet in 2007, and the Fund experienced an undisclosed event of default on its credit line from Textron in April 2007, which was not disclosed.  (Compl. ¶¶ 86-87.)  Barriger and McKean asserted in a letter of October 2007 that "positive progress continues to be made in a number of key areas," and reiterated that "we personally guaranteed the principal a floor minimum return of 8%."  (Compl. ¶¶ 95-96.)  A few months later, however, the Fund announced that its fortunes were taking a turn for the worse.  On December 31, 2007, Barriger described the Fund as "in a batten-down-the-hatches mode" as a result of "significant challenges" in the "entire real estate sector and the banking world."  (Compl. ¶ 101.)  It continued to make monthly 8% payments to investors.  (Compl. ¶ 101.)

A letter of March 14, 2008 announced to the plaintiffs, "for the first time," that some or all of their investment principal had been lost, and that the value of each capital account was recorded as "undetermined 0."  (Compl. ¶ 109.)  All investor withdrawals from the Fund were frozen on or about March 28, and on May 30, the Fund announced that collateral securing the Fund's loans "was inadequate to recover the principal."  (Compl. ¶¶ 110-11.)  In July 2008, the Fund announced that its portfolio showed no sign of recovery, that "most of the Fund's borrowers had very poor credit ratings at the time the loans were granted," and that any recovery by investors was indefinitely postponed, with the ultimate ceiling on recovery likely to be capped at 60 percent.  (Compl. ¶ 112.)

THE PARTIES

>    In addition to bringing claims against the Fund and Barriger, the plaintiffs have asserted claims against various entities and individuals affiliated with the Fund's operation.  G&B Partners Inc. ("G&B") was the Fund's managing member and sole common shareholder.  (Compl. ¶ 10.)  Barriger Capital LLC ("Barriger Capital") was the Fund's loan servicer.  (Compl. ¶ 12.)  It received a $30,000 monthly fee from the Fund.  (Compl. ¶ 12.)  Barriger and Barriger, Inc. ("B&B") is a registered broker-dealer.  (Compl. ¶ 14.)  Linda Barriger was the principal shareholder, director and officer of G&B and a principal of B&B.  (Compl. ¶ 15.)  Andrew McKean was the president, CEO and part owner of Barriger Capital and vice president of the Fund.  (Compl. ¶ 17.)  McKean is now deceased, and the Estate of Andrew McKean stands in his shoes.  (Compl. ¶ 17.)  Defendant Campus Capital, which owned 50 percent of Barriger Capital, was, in turn, owned by Lloyd Barriger, Linda Barriger and defendant Irwin Gitlin.  (Compl. ¶¶ 13, 19.)  Defendant Irwin Gitlin was a principal of defendant Gitlin Associates LLC ("Gitlin Associates"), an accounting firm that provided certain services to the Fund.  (Compl. ¶¶ 18-19.)  Defendant Gitlin Associates was responsible for preparing and issuing to each plaintiff an annual Schedule K-1 for tax reporting purposes.  (Compl. ¶ 18.)  Finally, defendant John Doe is the unknown individual or entity that acted as the Fund's auditors.  (Compl. ¶ 20.)[2]

>    The plaintiffs are all investors in the Fund.  Plaintiff Lloyd Heller first invested in the Fund in 1998.  (Compl. ¶ 136.)  In subsequent years, he increased his holdings in the Fund, until they totaled more than $265,000.  (Compl. ¶¶ 136-42.)

---

[2] Bridgeville Management LLC was voluntarily dismissed from this case by stipulation entered as an order by Judge Conner on April 16, 2009.  (Docket # 36.)

Plaintiff Martha Graham had a brokerage account at B&B, with Barriger acting as her main stockbroker and financial adviser.  (Compl. ¶ 144.)  In June 2007, she met with Barriger to discuss investing $30,000 in the Fund.  (Compl. ¶ 147.)  Barriger told Graham that he does not permit small investors into the Fund, but that he would make an exception for Graham.  (Compl. ¶¶ 146, 148.)

Plaintiff Paula Manzolillo maintained a brokerage account with B&B and retained Barriger as her principal adviser.  (Compl. ¶ 154.)  She invested mainly in stocks and municipal bonds, with her portfolio worth approximately $12,000-15,000.  (Compl. ¶ 154.)  In 2001, she approached Barriger for advice on how to invest $43,621, at which point Barriger solicited her to invest in the Fund and volunteered to waive the Fund's $60,000 minimum investment requirement.  (Compl. ¶ 154.)  According to the Complaint, Manzolillo told Barriger that she wanted to invest for retirement, and Barriger told her that the Fund would serve this purpose and allow for withdrawal of funds at any time.  (Compl. ¶¶ 155-56.)  She agreed to invest in the Fund, and after the 2005 reorganization, added further to her investment.  (Compl. ¶¶ 157-58.)  By the end of 2007, she had nearly $207,000 in the Fund.  (Compl. ¶ 159.)

Plaintiff Maria Grimaldi had a brokerage account at B&B, and retained Barriger as her stockbroker and financial adviser.  (Compl. ¶ 162.)  During the Fund's 2005 reorganization, she purchased approximately $31,200 worth of preferred interests in the Fund.  (Compl. ¶ 165.)  Barriger told her that the Fund held real estate and mortgages that were fully collateralized by the borrowers' real property.  (Compl. ¶¶ 166.)  He stated that the Fund's income exceeded the 8% distribution to investors, but that it placed its earnings in reserves.  (Compl. ¶ 166.)  Barriger also told Grimaldi that the Fund

loaned only to local businesses secured by local real property, and that the Fund was managed to have enough liquidity for investors to withdraw funds at any time.  (Compl. ¶¶ 168-69.)  By the end of 2007, Grimaldi had invested nearly $36,000 in the Fund. (Compl. ¶ 175.)

Plaintiff Carl Mills is the sole trustee and beneficiary of the Creamton Maple Trust.  (Compl. ¶ 177.)  According to the Complaint, Mills was persuaded to invest in the Fund because of Barriger's representations that the Fund was highly liquid and comparable to a money-market or savings account with higher returns.  (Compl. ¶ 185.)  He invested his life savings of $30,000 in the Fund through his trust.  (Compl. ¶ 186.)  After the 2005 reorganization, Mills reinvested his 8% return into the Fund. (Compl. ¶ 194.)  Mills asserts that he was reassured by Barriger's 2007 representation that the Fund was not negatively affected by the nationwide drop in real estate values. (Compl. ¶ 196.)  In December 2007, Mills invested another $11,000 in the Fund. (Compl. ¶¶ 198.)  At the end of 2007, Mills had more than $40,000 invested in the Fund. (Compl. ¶ 201.)

PROCEDURAL HISTORY

This action was commenced on October 31, 2008, and accepted by Judge Conner as related to Owens v. Gaffken & Barriger Fund LLC, et al., 08 Civ. 8414 (S.D.N.Y.).  An Amended Complaint was filed on February 24, 2009, and a Second Amended Complaint was filed on April 27, 2009.  On March 24, 2009, Judge Conner issued an Opinion and Order denying the plaintiffs' motion to appoint a receiver to take

control of the Fund.  (Docket # 34.)  Following Judge Conner's death, this matter and the

related <u>Owens</u> case were reassigned to me.  (Docket # 75.)

Four motions to dismiss are now pending.  They were filed, respectively,

by Gitlin & Associates and Irwin Gitlin; G&B and Lloyd Barriger; the Fund; and Linda

Barriger, B&B and Barriger Capital. (Docket # 37, 44, 47, 50.)  All defendants join the

motion to dismiss filed by the Fund.  Additionally, Gitlin & Associates and Irwin Gitlin

seek sanctions against the plaintiffs pursuant to Rule 11 and 15 U.S.C. § 78u-4(c).


STANDARD ON A MOTION TO DISMISS

A motion to dismiss a securities fraud claim is evaluated under the PSLRA

and Rules 9(b) and 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), "a

complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"

<u>ECA, Local 134</u>, 553 F.3d at 196 (quoting <u>Ruotolo v. City of New York</u>, 514 F.3d 184,

188 (2d Cir. 2008)).  "A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'"  <u>Ashcroft v. Iqbal</u>, 129 S. Ct.

1937, 1949 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u> (citations

omitted).  When a complaint's allegations are "merely consistent" with liability, it falls

short of alleging a plausible claim for relief.  <u>Id.</u>  A complaint's legal conclusions are not

afforded the presumption of truth.  <u>Id.</u> at 1949-50.  Only nonconclusory factual

- 11 -

allegations are to be accepted as true.  South Cherry Street, LLC v. Hennessee Group

LLC, 573 F.3d 98, 100 (2d Cir. 2009).

       In a securities fraud case, however, the plaintiff "must do more" than

satisfy Rule 12(b)(6).  Id. at 110.  The PSLRA has "imposed heightened pleading

requirements and a loss causation requirement upon 'any private action' arising from the

Securities Exchange Act."  Stoneridge Investment Partners, LLC v. Scientific-Atlanta,

Inc., 128 S.Ct. 761, 773 (2008) (quoting 15 U.S.C. § 78u-4(b)).  "Any complaint alleging

securities fraud must satisfy the heightened pleading requirements of the PSLRA and

Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud."

ECA, Local 134, 553 F.3d at 196 (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.,

551 U.S. 308, 321 (2007)).  This pleading threshold gives a defendant notice of the

plaintiff's claim, safeguards a defendant's reputation and protects against strike suits.

See ATSI Communications, Inc. v. Shaar Funds, 493 F.3d 87, 99 (2d Cir. 2007).  "A

securities fraud complaint based on misstatements must (1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent."  Id. at 99

(citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).

       The PSLRA requires a complaint to "specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity all facts on which that belief is formed."  15

U.S.C. § 78u-4(b)(1)(B).  Allegations of fraud may be "too speculative even on a motion

to dismiss," particularly when premised on "'distorted inferences and speculations.'"

ATSI, 493 F.3d at 104 (quoting Segal v. Gordon, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

"The [PSLRA] insists that securities fraud complaints 'specify' each misleading

statement; that they set forth the facts 'on which [a] belief' that a statement is misleading

was 'formed'; and that they 'state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind.'"  Dura Pharmaceuticals, Inc. v.

Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1), (2)).  To plead fraud

under the PSLRA, plaintiffs "must do more than say that the statements . . . were false

and misleading; they must demonstrate with specificity why and how that is so."

Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

      The PSLRA also "requires plaintiffs to state with particularity . . . the facts

evidencing scienter, i.e., the defendant's intention to 'deceive, manipulate, or defraud.'"

Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193

(1976).  To qualify as "strong," the "inference of scienter must be more than merely

plausible or reasonable – it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent."  Id. at 314.

      In considering a motion to dismiss, a court may consider documents

annexed to the complaint or incorporated in the complaint by reference without

converting the motion to dismiss into a motion for summary judgment.  Rombach, 355

F.3d at 169 (citing Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)).

DISCUSSION

> I.   The Plaintiffs' Claims Under Section 10(b) and Rule 10b-5
> are Dismissed.

> 1.   The Complaint Fails to Allege Fraud with Particularity.

Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. § 78j(b).  "The SEC rule implementing the statute, Rule 10b-5, prohibits 'mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.'"  ECA, Local 134, 553 F.3d at 197 (alterations in original) (quoting Rule 10b-5).  As Judge Cote has observed, "[s]ection 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith."  In re Openwave Systems Securities Litigation, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing Ernst & Ernst, 425 U.S. at 206).  The PSLRA also requires, with respect to allegations of false statements or omissions, that the Complaint specify the statements alleged to have been misleading, the reasons for the belief that the statements were misleading and, if the allegation is made upon information and belief, the Complaint must state, with particularity, the facts upon which the belief is formed.  ATSI, 493 F.3d at 99.

"Statements that are opinions or predictions are not per se inactionable under the securities laws.  Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are

supported by specific statements of fact . . . ."  In re Int'l Business Machines Corporate Securities Litigation, 163 F.3d 102, 107 (2d Cir. 1998) (emphasis added) (citations omitted) ("IBM"); see also Novak, 216 F.3d at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

The defendants argue that the Complaint fails to allege with particularity that the Fund's statements and omissions amounted to acts of fraud.  In opposition to the motions to dismiss, the plaintiffs contend that there were three distinct but overlapping phases during which the defendants engaged in securities fraud.  I will separately address each of these phases.  I note at the outset that the plaintiffs' theories of liability share a common impediment: a failure to reconcile the Complaint's allegations with the Fund's disclosures about the risks and instabilities that came with its foray into the subprime lending business, particularly the Fund's acknowledgment that a market downturn could "sabotage" returns.

A.  The 2005 Changes to the Fund.

The plaintiffs argue that they were defrauded into purchasing preferred shares in the Fund when the Fund underwent changes in structure and purpose in 2005.[3] They argue that in advance of the 2005 amendment to the Fund's LLC Agreement, the defendants unlawfully concealed risks in the Fund's plan to leverage itself and issue

---

[3] The defendants have argued that the 2005 changes to the Fund, in which the investors' holdings were converted to preferred shares, cannot constitute a purchase or sale of securities pursuant to Abrahamson v. Fletcher, 568 F.2d 862, 868 (2d Cir. 1977), and its progeny.  In Abrahamson and elsewhere, courts consider at the summary judgment stage whether a purchase or sale of securities occurred as part of an exchange of shares during a change to corporate form.  Summary judgment may, in many circumstances, be a more apt vehicle for considering such matters of changes in corporate form, since a more complete factual record is available to the court and to the parties.  For the purposes of this motion, I will assume that the 2005 conversion of shares constituted a purchase and sale of securities.

loans to subprime borrowers.  As pleaded in the Complaint, the arguments fail to satisfy

the threshold for pleading securities fraud under Rule 9(b) and the PSLRA.

          i.     The announced results of Barriger's investor survey were not
                 <u>misleading.</u>

      When the Fund shifted its investment strategy to focus on subprime real

estate loans, it polled its investors as to their preferred strategy.  In its July 30 letter, the

Fund noted that "the use of leverage which can greatly increase the return in good times

can conversely sabotage the return in tough times when real estate is not as readily

saleable."  (Compl. ¶ 45.)  It asked investors whether they wanted a modest and steady

return rate, or whether, by contrast, they had an appetite for "more risk and less

consistency" with higher returns.  (Compl. ¶ 45.)  In announcing the results of the survey,

Barriger stated that the majority of investors were "happy to leave the Fund exactly as it

is; some of you expressed a proclivity toward safety of principal and consistency of

return."  (Compl. ¶ 47.)

      This statement from Barriger on behalf of the Fund constituted an

announcement that the majority of investors wanted the Fund to continue its riskier

approach, including taking on large amounts of leverage and issuing loans to commercial

real estate borrowers – not, as the plaintiffs claim, a statement by the Fund that it was

pursuing the more conservative alternative.  The "some" who raised "safety of principal

and consistency of return" are denoted in contrast to those who wanted to leave the fund

"exactly as it is."  (Compl. ¶ 47.)  The choices were set forth in the survey question itself,

in which the Fund's investors were offered two explicit alternatives.  First, to "[l]eave

everything as is.  I don't mind some ups and downs as long as you think the total return

will be better over time."  (Barriger 2/20/09 Dec. Ex. E.)  The second alternative read: "I

want my holding to be safer, with a steady consistent return that I can either draw out monthly or re-invest."  (Barriger 2/20/09 Dec. Ex. E.)  The options presented to Fund investors were reasonably clear.

In addition, a defendant has some leeway in the verbiage used to disclose its leveraging activity.  See, e.g., In re New York Community Bancorp, Inc., Securities Litigation, 448 F. Supp. 2d 466, 482-83 (E.D.N.Y. 2006) (statement in prospectus that funds would be used for "general corporate purposes" is broad enough to adequately disclose the funds' use in leveraging); cf. DeMaria v. Andersen, 153 F. Supp. 2d 300, 313 (S.D.N.Y. 2001) (statement that IPO proceeds would be used as "working capital" was not misleading because proceeds were used to repay losses), aff'd, 318 F.3d 170 (2d Cir. 2003).  In this case, the Fund's statements concerning its investment strategies were more than adequate to notify the plaintiffs that it would continue a riskier, leverage-intensive approach.  Indeed, the Fund explicitly noted that it would take on leverage and that its approach risked "sabotage" in the event of a downturn.  (Compl. ¶ 45.)

Ultimately, the Fund appears to have made some attempt to reconcile the two goals by adopting its higher-risk real-estate strategy while simultaneously offering a "'floor' of a basic return on your money."  (Compl. ¶ 47.)  All returns earned in excess of the annual 8% "floor" were to be paid as part of an annual bonus dividend.  (Compl. ¶ 47.)  Barriger added that "if at any time going forward the Fund earns less than 8%, it will first be my capital account that will absorb the deficit."  (Compl. ¶ 47.)  In these statements, the Fund informed investors that they would plan for an 8% baseline return, with the possibility that certain years could see returns that were either higher or lower.

The communications cited by the plaintiff were not false or misleading, and did not omit

material information as to the Fund's risks.

      ii.     The amendment to the LLC Agreement and the related
<u>correspondence adequately disclosed changes to the Fund.</u>

      Barriger's letter announcing the survey results was accompanied by a

proposed amended LLC Agreement.  The amendment to the LLC Agreement is annexed

to the Complaint, and, as an integral part of the pleadings, I may consider it on a motion

to dismiss without converting the motion into one for summary judgment.  <u>Cortec</u>

<u>Industries, Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991).  As noted above, it

appears from the Complaint and annexed exhibits that Fund investors were also members

of the LLC.

      The amendment expressly changed the Fund's purpose to that of trading in

real estate investments.  (LLC Amendment § 2.6, attached at Compl. Ex. 4.)  The Fund

also converted ownership interests into classes of preferred and common shares.  (LLC

Amendment §§ 2.9, 2.10.)  According to the plaintiffs, the Fund failed to disclose the

risks involved in these changes, and did not disclose that the Fund's strategic changes

were contrary to its stated investment objectives.  (Opp. Mem. at 8-9.)  However, in

letters sent in 2005, the Fund alerted investors that it would incur leverage to proceed

with its strategy (Compl. ¶ 43); that such an approach would prompt the Fund "to take

more risk and less consistency and aim for higher returns" (Compl. ¶ 45); and that "the

use of leverage which can greatly increase the return in good times can completely

sabotage the return in tough times when real estate is not as readily saleable."  (Compl. ¶

45.)

It is true that these disclosures are intermingled with statements of optimism, flattery toward the Fund's investors, and an unusual series of paragraphs in which Barriger compared himself to Britain's Queen Elizabeth I and touted the benefits of following in the tradition of "the notorious miser Hetty Green."  (Compl. Ex. 7.)  By and large, it is fair to characterize Barriger's letters to Fund investors as highly conversational and interspersed with enthusiastic statements about the Fund's future prospects.  His mailings on behalf of the Fund, however, also apprised investors of the risks that attended its change in investment strategies, including the assertion that leveraging the Fund could "sabotage the return in tough times."  (Compl. ¶ 45.)

The events of 2005 preceding the amendment to the LLC Agreement, and the Agreement's eventual amendment, do not support a claim of securities fraud.

B.   The Fund's Increased Leverage from 2005-2007

The plaintiffs contend that between 2005 and 2007, the Fund became increasingly leveraged while lending to borrowers with poor credit.  As noted above, in April 2006 the Fund disclosed a $15 million loan from Textron Financial, and portrayed it as a positive development.  (Compl. ¶¶ 62, 65.)  The plaintiffs argue that statements concerning the Textron loan were misleading, inasmuch as they failed to disclose the existence of a "fraud guaranty" executed by Barriger and McKean.  (Compl. ¶ 66.)  The Textron agreement references the fraud guaranty executed by Barriger and McKean "with respect to transactions contemplated by the Loan Agreement," (Compl. Ex. 14 at 1 ¶B) but the Complaint otherwise makes no allegation as to the fraud guaranty's content.  Plaintiffs also assert that various statements were false and misleading because they asserted the credit line was "working out well," that the Fund was pursuing "promising"

leads, had received "mostly positive developments," and that the Fund unlawfully failed

to disclose that Platinum Properties had defaulted on the promissory notes held by the

Fund. (Compl. ¶¶ 64(c), 69-84.)  According to the plaintiffs, the Funds omitted material

information as to the Textron loan and made false and misleading statements about future

prospects, inasmuch as the Fund's high-leverage strategy was fraught with risk,

particularly in light of the subprime borrowers targeted by the Fund.

        These allegations fail to state a claim of fraud.  First, the Complaint fails

to allege with particularity that the fraud guaranty and the Platinum Properties default

were so material as to warrant disclosure.  The plaintiffs assert that reasonable investors

would have considered it important to know why Textron required a fraud guaranty.

However, "[i]t is not sufficient that plaintiffs have alleged that the undisclosed

information was material. '[A] corporation is not required to disclose a fact merely

because a reasonable investor would very much like to know that fact.  Rather, an

omission is actionable under the securities laws only when the corporation is subject to a

duty to disclose the omitted facts.'"  In re Optionable Securities Litigation, 577 F. Supp.

2d 681, 692 (S.D.N.Y. 2008) (quoting In re Time Warner Inc. Securities Litigation, 9

F.3d 259, 267 (2d Cir. 1993)).  The Complaint offers no plausible basis from which to

conclude that the inclusion of a fraud guaranty was anything but a standard requirement

of Textron, and the Complaint's assertion as to its materiality is conclusory.  That

Textron required a fraud guaranty from Barriger and McKean does not raise a reasonable

inference that the defendants believed that Textron suspected them of fraud.

        While it may, in retrospect, appear to be a harbinger of the defaults that

ultimately brought down the Fund, the default on the Platinum Properties promissory

notes is not described as an event so material that the Fund was required to disclose it to investors.  The Complaint has failed to allege that the Platinum Properties default put the Fund's returns at risk, and, indeed, alleges that the Fund's strategy of "asset-based lending" was based in part on the expectation that borrowers would default and the Fund would recover principal and interest while the borrower was in foreclosure or bankruptcy. (Compl. ¶ 37.)

Barriger's statements touting "promising leads" and "mostly positive developments" on behalf of the Fund are too vague and non-specific to provide grounds for a fraud claim.  To survive a motion to dismiss, a plaintiff must "explain why the statements were fraudulent." Novak, 216 F.3d at 306 (quotation omitted).  "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.  . . .  Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." Id., 216 F.3d at 309 (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)); see also Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("lack of clairvoyance simply does not constitute securities fraud").  "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." Novak, 216 F.3d at 309.  Barriger's optimistic statements concerning the Fund's pursuit of promising leads and positive developments do not support a fraud claim.

The Complaint's allegations of statements, omissions, actions and inactions in the period from 2005 to 2007 fail to state a claim for securities fraud.

C.  The Complaint Fails to Identify Fraudulent Statements or Omissions
    <u>as to the Fund's Operations in 2007-2008.</u>

    i.    The Complaint fails to allege that the defendants
    fraudulently concealed developments related to the line of
    <u>credit from Textron.</u>

The plaintiffs argue that at some point prior to March 2008, the defendants knew that the Fund's highly leveraged investment strategy was failing.  They also contend that the defendants engaged in securities fraud because the plaintiffs never were informed that the Fund defaulted on its lending agreement with Textron by issuing unsecured promissory notes.  According to the plaintiffs, the failure to disclose an event of default on the Textron loan and the failure to disclose the scope of damage inflicted by the subprime lending crisis were fraudulent omissions.  (Opp. Mem. at 9.)

First, I address the purported "event of default."  The Complaint asserts that "[i]n or about April 2007, the Fund began issuing unsecured promissory notes, payable on demand with interest, which constituted an event of default under the Fund's lending agreement with Textron."  (Compl. ¶ 87.)  The Complaint contains no additional details as to the purported issuance of these unsecured promissory notes, although it does cite to a section of an agreement between Textron and the Fund that recites various events of default.  (Compl. ¶ 87.)  The Complaint does not identify which of the Textron agreement's defined events of default are alleged to apply to the promissory notes.  In addition to the Complaint's vagueness as to the purported event of default, the Complaint does not allege that Textron actually declared an event of default arising out of the unsecured promissory notes.

A later letter sent on behalf on the Fund did, however, disclose the risks of an event of default on the Textron loan.  The letter of March 30, 2008 stated that the Fund

had approached Textron for a credit line to finance its operations.  (Compl. Ex. 31.)  The

letter proceeded to state that if the Fund could not obtain Textron's consent to use

available cash, Textron could declare the Fund in default, which would prevent the Fund

from operating effectively.  (Compl. Ex. 31.)  The March 30, 2008 letter explains in

detail the possibility and consequences of such an event.

It is possible to fraudulently conceal an event of default while disclosing

the risk of another, but the March 30, 2008 letter illustrates the thinness of the

Complaint's allegations concerning the purported event of default in April 2007.  The

Complaint attempts to assert heightened significance to the April 2007 promissory notes

by asserting that they were issued in connection with an increasing number of subprime

defaults.  (Compl. ¶ 88.)  However, this allegation of a spike in defaults by the Fund's

subprime borrowers lacks particularity, making reference to no defaults other than

Platinum Properties and identifying no dates or monetary losses caused by or relating to

the purported defaults.  (See generally Compl. ¶¶ 84-88.)

The non-specific assertions of increasing borrower defaults do not satisfy

the obligation to plead fraud with particularity under the PSLRA and Rule 9(b).

Similarly, the Complaint's averment of a 2007 event of default on the Textron loan is

conclusory in nature and fails to satisfy the particularity requirements.  The Complaint

does not adequately explain why the disclosures of March 30, 2008 should have been

made sooner.  Novak, 216 F.3d at 306.

    ii.    Much of the Complaint merely alleges retrospective
            displeasure with aspects of the Fund's strategy.

Plaintiffs assert that statements by Barriger on behalf of the Fund

misleadingly asserted that Fund assets had exceeded $32 million, and later $40 million, in

part because of the "qualitatively excessive" risks involved with the Fund's investment approach.  (Compl. ¶¶ 89-92.)

    The Complaint does not explain what it means by the phrase "qualitatively excessive," or how the statements of Fund assets could be construed as fraudulent, as the plaintiffs are required to do by the PSLRA and Rule 9(b).  See Novak, 216 F.3d at 306. In addition, the Complaint fails to supply any meaningful detail as to the defaults experienced by entities who borrowed from the Fund and when borrower defaults reached a point so material that the Fund was obligated to disclose them to investors. Aside from Platinum Properties, no defaulting entities are identified.  Throughout, the Complaint references declines in the market for subprime real estate loans, as well as the Fund's steady appetite for leverage, but the Complaint never identifies a date, event or circumstances that triggered an obligation to make greater disclosure as to the level of borrower default.  The allegations amount to retrospective critiques of an investment strategy that, to the plaintiffs' misfortune, resulted in failure.

    Finally, beginning at the close of 2007, the Fund's statements apprised investors that it was experiencing distress as part of a broader downturn in the national real estate market.  A December 31, 2007 letter referenced the "housing asset bubble with related credit repercussions" and stated that the Fund was in "batten-down-the-hatches-mode."  (Compl. Ex. 24.)  In March 2008, the Fund notified its investors that "[t]his global credit crunch that is so widely discussed in the media has hit us and hit us hard." (Compl. Ex. 27.)  A May 30, 2008 letter stated that it was written in part "to describe the major risks we face as we press forward toward our goals of deleveraging our capital structure (i.e. paying off all debt) and putting the Fund in a position to renew new

business operations . . . ."  (Compl. Ex. 31.)  The letter added, "I am grateful that we did

not deploy greater leverage, because we would have shared the fate of many financial

institutions that were completely wiped out."  (Compl. Ex. 31.)  The letter detailed the

value of the Fund's assets, a $10.5 million decline in investors' capital accounts and the

rise in borrower defaults.  (Compl. Ex. 31.)

    Thus, beginning at the close of 2007, the Fund put its investors on notice

that it was facing serious challenges as result of changes in the real estate climate.  The

Complaint describes these disclosures as being too little, too late, but does not set forth

with particularity any earlier point in time when the Fund's holdings had or would suffer

to such a material extent that disclosure was required.  The plaintiffs fail to state a claim

that the Fund's actions in 2007 through 2008 amount to securities fraud.

    2. <u>The Complaint Fails to Allege Loss Causation.</u>

    In order to state a valid claim under section 10(b) and Rule 10b-5, a

plaintiff must allege that his reliance on a defendant's misstatements and/or omissions

proximately caused his injury.  <u>IBM</u>, 163 F.3d at 106.  Loss causation "is the proximate

causal link between the alleged misconduct and the plaintiff's economic harm."  <u>ATSI</u>,

493 F.3d at 106.  "To establish loss causation a plaintiff must show, that the economic

harm that it suffered <u>occurred as a result of</u> the alleged misrepresentations."  <u>Citibank,

N.A. v. K-H Corp.</u>, 968 F.2d 1489, 1495 (2d Cir. 1992) (emphasis in original).  "Put

another way, a misstatement or omission is the 'proximate cause' of an investment loss if

the risk that caused the loss was within the zone of risk <u>concealed</u> by the

misrepresentations and omissions alleged by a disappointed investor."  <u>Lentell v. Merrill

Lynch & Co., Inc.</u>, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original); <u>see also</u> <u>In re</u>

AOL Time Warner, Inc. Securities Litigation, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (loss causation allegations must show that "a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss.").

Plaintiffs maintain that the Complaint sufficiently alleges loss causation in three ways. First, they contend that the defendants wrongfully sold Fund securities to unqualified investors. Second, they contend that the Fund failed to ensure a modest, steady and reliable income stream. Third, they contend that the use of leverage and the loans to subprime borrowers caused plaintiffs' losses. I address these three loss causation theories in turn.

First, the 1998 PPM offered to investors a minimum of one share in the Fund at a price of $50,000 per share. (Compl. Ex. 1 at 1.) Under the heading "Investor Suitability Standards," the 1998 PPM noted that purchase of membership interest was speculative with a high degree of risk and "not a suitable investment for all potential investors." (Compl. Ex. 1 at 9.) It limits purchase to accredited investors, but states that the Managing Member of the Fund has sole discretion to sell shares to "a limited number" of non-accredited investors. (Compl. Ex. 1 at 9.) Accredited investors were required to have an individual income in excess of $200,000 or a net worth of more than $ 1 million. (Compl. Ex. 1 at 9-10.) Non-accredited investors are defined as individuals capable of bearing the economic risks of investing in the Fund and evaluating its risks and benefits. (Compl. Ex. 1 at 10.) The plaintiffs do not contend that they were not given the 1998 PPM, or that they lacked knowledge of their own investment abilities at the time they invested in the Fund. The Complaint's allegations as to the 1998 PPM's

accredited investor standard are inadequate to set forth a cognizable theory of loss causation.[4]

Second, the plaintiffs argue that the Fund had assured them a modest and reliable income stream, and that they suffered as a result of that representation.  As discussed above, however, this argument fails to reckon with the Fund's various disclosures about the risks attendant to its investments, "including the possible substantial loss of their investment" and that investment should be pursued by those who "have no need for immediate liquidity with respect to their investment . . . ."  (Compl. Ex. 1 at 11.) "Securities offering the potential for capital appreciation may be subject to greater risk than securities which do not have such potential."  (Compl. Ex. 1 at 11.)  "[T]he value of a Membership Interest in the Fund at the time it is redeemed may be more or less than such Membership Interest's value at the time of purchase."  (Compl. Ex. 1 at 12.)

Third, the plaintiffs argue that the Fund became overleveraged and extended loans to sub-prime borrowers who were not creditworthy.  As the plaintiffs acknowledge, however, the Fund was explicit in acknowledging that "the use of leverage which can greatly increase the return in good times can conversely sabotage the return in tough times when real estate is not as readily saleable."  (Compl. ¶ 45.)  Oddly, the plaintiffs cite the Fund's disclosure that its investment strategy could be "sabotage[d]" in "tough times" as evidence of loss causation, and assert that the Fund never should have pursued such a strategy in the first place.  (Opp. Mem. at 19.)  The Fund's own

---

[4] The plaintiffs' contentions about their qualifications to invest might be more relevant to questions of transaction causation, as opposed to loss causation.  See Lentell, 396 F.3d at 172 ("Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'") (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)).  ATSI similarly concluded that questions of investor accreditation were more relevant to issues of transaction causation than loss causation.  493 F.3d at 106-107.  Defendants have not argued that the Complaint inadequately alleges transaction causation.

acknowledgment of risks that it likely would confront in a market downturn does not

support a theory of loss causation.  Based on the disclosures cited in the Complaint,

annexed thereto and quoted in the plaintiffs' opposition memo, this is not an instance in

which a "concealed risk – the volatility of the actual investments – lowers the value of

[plaintiffs'] portfolio."  In re Initial Public Offering Securities Litigation, 399 F. Supp. 2d

298, 303 (S.D.N.Y. 2005) (analyzing various potential loss-causation scenarios).  The

Fund's investment strategy may have been unsuccessful, but the attendant risks were

sufficiently disclosed.  A risk disclosure that cautioned investors of a later-realized loss

does not support a claim of loss causation.

   3. The Complaint Fails to Raise a Strong Inference of Scienter.

    The PSLRA requires a plaintiff to "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.

§ 78u-4(b)(2).  The statute "unequivocally raise[d] the bar for pleading scienter."

Tellabs, 551 U.S. at 321 (alteration in original; quotation marks omitted).  In scrutinizing

a complaint's allegations of scienter, a court is to consider "whether all of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard."  Id. at 322-23

(emphasis in original).  A court also "must take into account plausible opposing

inferences."   Id. at 323.  This requires close scrutiny of the factual allegations:

> The strength of an inference cannot be decided in a vacuum. The inquiry is
> inherently comparative: How likely is it that one conclusion, as compared
> to others, follows from the underlying facts? To determine whether the
> plaintiff has alleged facts that give rise to the requisite "strong inference"
> of scienter, a court must consider plausible nonculpable explanations for
> the defendant's conduct, as well as inferences favoring the plaintiff. The
> inference that the defendant acted with scienter need not be irrefutable,
> i.e., of the "smoking-gun" genre, or even the "most plausible of competing

inferences[.] . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Id. at 323-24.  Defendants' pecuniary motive is a relevant consideration, although an absence of motive is not alone dispositive.  Id. at 325.  Personal financial gain on the part of a defendant weighs in favor of a scienter inference.  Id.  If a complaint contains ambiguities or omissions, those weigh against inferring scienter.  Id. at 326.

In the Second Circuit, scienter may be pleaded by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.  Circumstantial evidence may go toward showing "deliberate illegal behavior," or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  Novak, 216 F.3d at 308 (quotation marks omitted).  "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount."  Id. at 308 (internal citation omitted).  As to recklessness, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."  Id. at 309.

The allegations do not support a strong inference of scienter.  The Complaint does not raise an inference that the defendants intended to defraud the plaintiffs, and no allegation plausibly asserts that the defendants personally profited from

any alleged misstatement or omission that result in loss to the plaintiffs.  The plaintiffs have set forth only a conclusory allegation that Barriger intended to deceive the plaintiffs into signing the 2005 LLC Agreement in order to personally profit from Fund returns exceeding 8% while using investment principal as a cushion against his risk of loss.  The allegations include the following:

> Barriger, contrary to his claiming for himself the same selflessness and loyalty he attributed to Queen Elizabeth, was actually structuring the 2005 reorganization to take for himself a disproportionate share of potential profits, while capping plaintiffs' profit potential, imposing on plaintiffs a disproportionate risk of loss; and restricting plaintiffs' [sic] from withdrawing their investments until their death, unless he gives permission . . . .

(Compl. ¶ 46(f).)  The Complaint elsewhere asserts recklessness and conscious "misbehavior" for inadequately disclosing investment risks, issuing "soothing – but misleading – reassurance to plaintiffs," and reiterates that Barriger was in a position to "become entitled to all of the potential profits from the Fund's risky lending strategy" while leaving the plaintiffs vulnerable to risks of loss.  (Compl. ¶¶ 205-06.)

In opposition to the defendants' motion, the plaintiffs also have cited the following allegations as supporting a strong evidence of scienter.  I address each of them in turn, and note at the outset that, taken collectively, they fail to raise a strong inference of scienter.  Tellabs, 551 U.S. at 322.

### A.  Barriger's failure to disclose the Fund's leveraged loans to subprime borrowers.

As discussed above, the Fund sufficiently disclosed the risks attendant to its investment strategy.  To the extent that certain matters were not disclosed to investors, such as the Textron fraud guaranty and the Platinum Properties default, the plaintiffs have not alleged a plausible claim that they were material and required disclosure.

B.  <u>The sale of shares to plaintiffs as unaccredited investors.</u>

The plaintiffs argue that in selling shares to the plaintiffs as unaccredited investors, Barriger engaged in reckless or knowingly fraudulent misconduct.  As alleged in the Complaint, the plaintiffs were largely inexperienced investors who accepted Barriger's investment advice at face value and proceeded to contribute significant portions of their life savings to the Fund.

The 1998 PPM unambiguously stated that the Managing Member of the Fund has sole discretion to sell shares to "a limited number" of non-accredited investors. (Compl. Ex. 1 at 9.)  For reasons that are not apparent in the Complaint, Barriger elected to sell shares in the Fund to the plaintiffs.  The plaintiffs do not allege that the 1998 PPM, the LLC Agreement, the subscription agreement or relevant correspondence from Barriger on behalf of the Fund were concealed from them.  Barriger's willingness to accept the investments of these unaccredited investors might have supported an inference of scienter if accompanied by additional allegations of fraud or recklessness, but the mere fact that the plaintiffs were unaccredited investors under the terms of the 1998 PPM does not, standing alone, support an inference of fraud or recklessness.

C.  Barriger's failure to disclose the events of 2006-2007, including the Platinum Properties default, the event of default on the Textron loan, <u>and the Fund's loss of liquidity.</u>

As discussed above, the Complaint fails to plead with particularity how the Platinum Properties default, the purported "event of default" on the Textron loan or the Fund's loss of liquidity were material and required disclosure.  These incidents do not support an inference of scienter.

D.  Barriger's "reassurances" do not raise a strong inference of scienter.

Plaintiffs argue that Barriger continued to mislead investors beginning in at least April 2007, when the Fund began to experience decreasing liquidity.  (Opp. Mem. at 21-22.)  According to the plaintiffs, Barriger had an incentive to encourage the plaintiffs to reinvest their monthly dividend payments into the Fund and continue to purchase shares in order to keep the Fund liquid and afloat.  (Opp. Mem. at 21-22.)  This theory, however, fails to reckon with the disclosures made in the correspondence discussed above at section I(1)(C).  Such disclosures of risk are inconsistent with a state of mind going toward "deliberate illegal behavior" or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  Novak, 216 F.3d at 308.

E.  Barriger's Motive and Opportunity to Commit Fraud.

Lastly, the plaintiffs argue that after the Fund's 2005 reorganization, Barriger had a stronger motive and opportunity to commit acts of fraud.  According to the plaintiffs, after the reorganization was completed, Barriger was left as the sole common shareholder, while the plaintiffs and other investors held preferred interests in the Fund. The plaintiffs contend that Barriger was permitted to profit from the Fund to the extent that returns exceeded 8% annually, while returns paid to the plaintiffs and other investors were essentially capped at 8%.  Thus, Barriger could benefit from the Fund's upswings by pocketing returns in excess of 8% while being insulated from the Fund's collapse. (Opp. Mem. at 22-23.)

It is true that by virtue of his position within the Fund, Barriger may have had opportunity to defraud the plaintiffs and other investors.  The Complaint, however,

does not include any allegation that Barriger actually received any undisclosed benefit by virtue of his position as common shareholder in the Fund.

In a footnote, the plaintiffs argue that the Fund had promised that net losses would be allocated to Barriger as the common shareholder, thus providing a buffer from catastrophic losses to the Fund.  (Opp. Mem. at 22 n.17.)  They argue that this "buffer" proved inadequate.  There is, however, a distinction between arguing that the plaintiffs lacked a sufficient "buffer" against loss and plausibly alleging that Barriger personally profited from the Fund at the expense of the plaintiffs.

The plaintiffs' allegations concerning the LLC's post-2005 structure does not raise a cogent and compelling inference of scienter.

    4.    Distinctions Between the Complaint in This Case and the Complaint in Owens v. Barriger, et al., 08 Civ. 8414 (PKC).

In a related securities fraud case, Owens v. Barriger, et al., 08 Civ. 8414, 2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009), I declined to grant a motion to dismiss.  I will briefly point out important differences between the allegations in this case and those in Owens.

The Owens plaintiff alleges that he never received key documents integral to the Fund's operations and strategy, specifically the PPM, the LLC Agreement and the Subscription Agreement.  In Owens, the plaintiff invested in the Fund based solely on oral representations made by Barriger and McKean, including unambiguous guarantees that he would receive an 8% return on investment and that the Fund was equivalent to a money market account.  The plaintiff alleged that these statements induced him to invest in the Fund, particularly including Barriger's purported "guarantee" of 8% returns.  He further alleged that he never had the opportunity to review the extensive disclosures as to

the Fund's appetite for risk and its investment strategy, as they were set forth in Fund documents that he never received. Because it is alleged that the Fund accepted a $2 million investment from the <u>Owens</u> plaintiff without ensuring that he received or executed critical Fund disclosures, and because the <u>Owens</u> plaintiff acted on oral "guarantees" and representations without the chance to review risk disclosures, I concluded that he successfully pleaded fraudulent conduct, loss causation and scienter.

        Unlike <u>Owens</u>, this case is not premised on the defendants' failure to disclose key fund documents. I note that in their opposition memo to the Fund's motion to dismiss, the plaintiffs argue that it is the Fund's burden to prove that the plaintiffs received the 2007 PPM. (Opp. Mem. at 11, 17.) However, the Complaint does not allege non-receipt of the 2007 PPM, and explicitly relies on its contents and annexes the 2007 PPM as an exhibit. (Compl. ¶¶ 53-59 & Ex. 4.) The plaintiffs' opposition memo stops short of asserting that the plaintiffs never received the 2007 PPM – instead, they argue that the Complaint does not allege receipt and reliance on the 2007 PPM, and that it is the defendants' burden to prove receipt. This argument misapprehends that it is plaintiffs' duty to allege facts in their complaint setting forth a plausible claim for relief. More importantly, the plaintiffs' theory of liability is that the Fund's descriptions of risk preceding the 2007 PPM were inadequate in light of other positive statements made about the Fund's investment prospects. The 2007 PPM is alleged to be a document in which the previously undisclosed condition of the Fund was belatedly disclosed. (Compl. ¶¶ 56-57.) The allegations here differ from the allegations in the <u>Owens</u> complaint, and, as discussed above, the Complaint here fails to satisfy the PSLRA and Rules 12(b)(6) and 9(b), Fed. R. Civ. P.

II.     Plaintiffs' Section 10(b) and Rule 10b-5 Claim Against Gitlin &
        <u>Associates and Irvin Gitlin is Dismissed.</u>

Because it is based on a slightly different theory of liability, I separately

address the securities fraud claim against Gitlin & Associates and Irvin Gitlin (the "Gitlin

defendants").  According to the Complaint, the Gitlin defendants acted as the Fund's

accountants and were responsible for preparing the plaintiffs' tax documents, specifically

including the Schedule K-1 statements provided to each plaintiff.  (Compl. ¶¶ 114-16.)

The Complaint asserts that the Gitlin defendants owed plaintiffs a duty of diligence to

identify incorrect or inconsistent information.  (Compl. ¶ 116.)  According to the

plaintiffs, the Gitlin defendants failed to undertake adequate and independent

investigation of the Fund's representations concerning its financial health.  (Compl. ¶

120.)  The plaintiffs allege that the Gitlin defendants were deceptive, misleading and

fraudulent in failing to identify and disclose wrongdoing related to the following: the

Fund's 2005 reorganization; the Fund's high debt level; liquidity swings; increasing

subprime defaults; the purported event of default on the Textron loan; the Fund's alleged

conduct as a Ponzi scheme; and the "inflated" statements of the Fund's assets and net

worth.  (Compl. ¶ 120.)

        "[T]o state a § 10(b) claim against an issuer's accountant, a plaintiff must

allege a misstatement that is attributed to the accountant 'at the time of dissemination,'

and cannot rely on the accountant's alleged assistance in the drafting or compilation of a

filing."  <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 153 (2d Cir. 2007) (citing

<u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 174 (2d Cir. 1998)).  "Conduct itself can be

deceptive, and so liability under § 10(b) or Rule 10b-5 does not require a specific oral or

written statement." <u>United States v. Finnerty</u>, 533 F.3d 143, 148 (2d Cir. 2008) (citing

<u>Stoneridge</u>, 128 S.Ct. at 769) (internal quotation marks omitted).  But, "broad as the

concept of 'deception' may be, it irreducibly entails some act that gives the victim a false

impression." <u>Id.</u>  "Public understanding that an accountant is at work behind the scenes

does not create an exception to the requirement that an actionable misstatement be made

by the accountant.  Unless the public's understanding is based on the accountant's

articulated statement, the source for that understanding — whether it be a regulation, an

accounting practice, or something else — does not matter." <u>Id.</u> at 150 (quoting and

approving <u>Lattanzio</u>, 476 F.3d at 155).

   The Complaint does not state an actionable claim that the Fund or

defendants affiliated with the Fund engaged in fraudulent conduct.  Because the claim

against the Gitlin defendants is premised on their failure to identify and/or disclose such

fraud, the claim is dismissed.  In addition, the Complaint has failed to cite to any specific

misrepresentations or omissions pertaining to the Schedule K-1 statements provided to

plaintiffs.  Copies of the 2007 Schedule K-1 statements for plaintiffs Heller, Manzolillo

and Grimaldi are annexed to the Complaint (Compl. Exs. 33, 35, 36) but otherwise the

pleadings are silent as to the contents of the K-1s.  As noted by the Gitlin defendants, the

Complaint fails to allege the value of plaintiffs' investments as they were set forth on the

K-1s, any amount that the plaintiffs claim as the actual value of their investments, or the

extent to which their investments' value was overstated on the K-1s.

   In addition, the Complaint does not assert flaws in any methodology

employed by the Gitlin defendants to report the value of plaintiffs' investment for income

tax purposes.  As Judge Kaplan noted in <u>Fraternity Fund Ltd. v. Beacon Hill Asset</u>

Management LLC, 376 F. Supp. 2d 385, 395-96 (S.D.N.Y. 2005), the value of certain securities not traded in a public exchange may be difficult to ascertain, and may partially depend on an exercise of independent judgment.  It is not always self-evident that one method of valuing a fund is superior to another.  Id. at 396.  The complaint has not offered any allegations as to how the Gitlin defendants employed a flawed methodology in assembling the plaintiffs Schedule K-1 forms.

The section 10(b) and Rule 10b-5 claim against the Gitlin defendants is dismissed.


III.     The Plaintiffs' Section 20(a) Claim is Dismissed.

To state a claim of control person liability under Section 20(a), a plaintiff must allege (1) primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) meaningful culpable participation in the controlled person's acts of fraud.  ATSI, 493 F.3d at 108.  Because the Complaint fails to state a primary violation, the plaintiffs' section 20(a) claim is dismissed.

In addition, the Complaint sets forth no basis from which to conclude that Linda Barriger acted as a control person over the Fund, G&B, Barriger Capital or Lloyd Barriger, or that defendants Irwin Gitlin and Gitlin Associates LLC were control persons of Barriger Capital.  The Complaint's control person allegations are limited to legal conclusions (Compl. ¶¶231-32, 234) and therefore are not entitled to the presumption of truth.  Iqbal, 129 S. Ct. 1949-50.

The plaintiffs' section 20(a) claims are dismissed.

IV.   The Request for Sanctions by Gitlin & Associates and Irwin Gitlin
is Denied Without Prejudice.

In addition to moving to dismiss the claims against them, the Gitlin

defendants seek sanctions and attorneys' fees pursuant to Rule 11(b), Fed. R. Civ. P., and

15 U.S.C. § 78u-4(c). The PSLRA includes a sanctions provision establishing "a

presumption that, 'for substantial failure to comply with any requirement' of Rule 11(b),

the award shall be the full amount of the reasonable attorneys' fees and costs."  Gurary v.

Nu-Tech Bio-Med, Inc., 303 F.3d 212, 215 (2d Cir. 2002) (emphasis in original) (quoting

15 U.S.C. § 78u-4(c)(3)(A)), cert. denied, 538 U.S. 923 (2003).  Determination of

sanctions occurs after the "final adjudication" of the case.  15 U.S.C. § 78u-4(c)(i).

The Advisory Committee Note accompanying the 1993 amendment to

Rule 11 states that "requests for sanctions must be made as a separate motion, i.e., not

simply included as an additional prayer for relief contained in another motion."  146

F.R.D. 577, 591.  The requirement of a separate motion is not construed as permissive in

nature.  See Martens v. Thomann, 273 F.3d 159, 178 (2d Cir. 2001) (Sotomayor, J.) (Rule

11 motion must be filed as a stand-alone motion); Florio v. City of New York, 2008 WL

2854116, at *5 n.63 (S.D.N.Y. July 22, 2008) (declining to address Rule 11 sanctions

request raised as part of motion for judgment on the pleadings); Gravagna v. Terminix

International, Inc., 2008 WL 2765336, at *2 (S.D.N.Y. July 9, 2008) (Rule 11 motion "is

denied without prejudice on the ground that it was not made by separate motion . . . .").

The Gitlin defendants' request for sanctions is denied without prejudice to

renewal now that the motion to dismiss has been adjudicated.  The premotion conference

requirement is waived as to the Gitlin defendants' motion.  Any such motion should

demonstrate the reasonableness and appropriateness of the attorneys' fees and expenses

to which they claim they are entitled.  See Arbor Hill Concerned Citizens Neighborhood

Ass'n v. County of Albany, 522 F.3d 182 (2d Cir. 2008).


      V.      The Court Declines to Exercise Supplemental Jurisdiction Over the
                  Remaining State Law Claims.

      In addition to their federal securities law claims, the plaintiffs also assert

two causes of action under New York law, one for breach of contract and another for

common law fraud.  I decline to exercise supplemental jurisdiction over the two

remaining state law claims.

      Section 1367 of title 28 of the United States Code governs the exercise of

supplemental jurisdiction and states in relevant part:

> [I]n any civil action of which the district courts have original
> jurisdiction, the district courts shall have supplemental jurisdiction
> over all other claims that are so related to claims in the action
> within such original jurisdiction that they form part of the same
> case or controversy under Article III of the United States
> Constitution.

28 U.S.C. § 1367(a).  Section 1367(c)(3) states that a district court "may decline to

exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district

court has dismissed all claims over which it has original jurisdiction . . . ."  Although

section 1367(c)(3) is couched in permissive terms, the Second Circuit has made clear that

the Court's discretion "is not boundless."  Valencia ex rel. Franco v. Lee, 316 F.3d 299,

305 (2d Cir. 2003).  In Valencia, the Second Circuit held that the district court abused its

discretion by exercising jurisdiction over a state-law claim following dismissal of the

plaintiffs' federal claims at summary judgment.  Id. at 307-08.  At the time the plaintiffs

conceded an absence of viable federal claims, "most of the anticipated pretrial discovery

had been completed," no judicial opinions had issued, and the case was not yet trial-ready.  Id. at 306.  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims."  Id. at 305.  In deciding whether to exercise jurisdiction over supplemental state-law claims, district courts should balance the values of judicial economy, convenience, fairness, and comity – the "Cohill factors."  Klein & Co. Futures, Inc. v. Board of Trade of City of New York, 464 F.3d 255, 262 (2d Cir. 2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)).

The Second Circuit has deemed it proper to retain supplemental jurisdiction over state-law claims in actions that implicate preemption issues, state law claims that remain when federal claims are voluntarily dismissed days before the scheduled start of trial, and state law claims that remain after the district court considered three dispositive motions.  Valencia, 316 F.3d at 306.  See also Arthur Glick Truck Sales, Inc. v. H.O. Penn Machinery Co., 332 F. Supp. 2d 584, 586 (S.D.N.Y. 2004) (plaintiff's voluntary dismissal of single federal claim warranted remand to state court for lack of supplemental jurisdiction over the remaining state-law claims); Den Hollander v. Flash Dancers Topless Club, 340 F. Supp. 2d 453, 463 (S.D.N.Y. 2004) (dismissing state-law claims following dismissal of RICO claim, and noting that "[w]hile district courts are capable and are bound to apply the state law to claims, '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable law.'") (quoting New York v.

Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 670 (W.D.N.Y. 2003)).

        The Complaint asserts that the Court has federal question jurisdiction over the securities claims, with pendant jurisdiction over state-law claims.  (Compl. ¶ 1.) Plaintiff Graham is alleged to be a resident of Florida and plaintiff Manzolillo is alleged to be a resident of Georgia (Compl. ¶¶ 143, 153.), but all other parties are either identified as residents of New York or else are not attributed residency to any particular state.  This action between New York plaintiffs and defendants lacks complete diversity. I have now dismissed the plaintiffs' federal securities law claims.  The Cohill factors of judicial economy, convenience, fairness and comity weigh against exercising supplemental jurisdiction over claims between New York parties implicating only New York state law, particularly considering that discovery has not commenced and that the federal claims have been dismissed at the pleading stage.

        The plaintiffs' claims for breach of contract and common law fraud are dismissed without prejudice.


CONCLUSION

        The defendants' motions to dismiss the federal securities laws claims are GRANTED.  The Court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims, which are dismissed without prejudice.  The motions are terminated. (Docket # 37, 44, 47, 50.)

        The Gitlin defendants' motion for sanctions is denied without prejudice to renewal.

- 41 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       November 17, 2009